# SUPREME COURT OF TEXAS.

## AUSTIN SESSION, 1868.

---

### W. G. KENNEDY v. C. H. MORRISON.
### C. H. MORRISON v. W. G. KENNEDY.

If the petition clearly set forth the cause of indebtedness against the defendant, from which the amount claimed is clear, and the plaintiff swear to the truth thereof, the attachment ought not to be quashed for want of the averment that the "defendant is justly indebted," in a specified amount, either in the petition or affidavit. (Paschal's Dig., Arts. 138, 142, Notes 257, 259.)

The petition filed under oath must show clearly the amount due, and whether it be justly due or not does not depend upon the sworn statement, but upon the proofs.

The stamp required by the act of congress of 1862, now repealed, might as properly be upon the writ of attachment or summons as upon the petition, although the petition is the leading process in the suit. (Paschal's Dig., Arts. 1426, 1431, Note 543.)

The object of the stamp law was to collect fifty cents revenue in every suit.

An interlocutory judgment is an order between the commencement of the suit and a final judgment.

The final judgment is the last or conclusive judgment, which settles the rights of the parties.

Where the defendant had given special bail in an attachment proceeding, and judgment went against the defendant, the court had to decide, as a final act, whether judgment should be rendered against the sureties, and the refusal to so render was final, from which the plaintiff could appeal. (Paschal's Dig., Arts. 152, 153.)

Whether the judgment be that the defendant go hence, &c., or that the plaintiff recover, &c., or that a new trial be refused, this last act is a final judgment, and, if the defendant appeal from that, he may bring in review the whole record.

When the property is attached, the defendant may release it by giving a de-

livery bond, as provided in the 12th section of the act, or by giving special bail for the amount of the debt, as provided for in the 14th section. (Paschal's Dig., Arts. 150, 152.)

The 14th section reads as follows: "Any person against whose property an attachment has issued, his agent or attorney, may at any time before final judgment, upon giving special bail, with good and sufficient sureties, for the amount of the debt and interest, recover possession of the property so attached, from the person in whose hands it may be; but the giving such special bail shall be deemed an appearance of the defendant, and the suit shall thereupon proceed as in ordinary cases; but if the plaintiff recover, he shall have judgment against all the obligors in the bail bond." (Paschal's Dig., Art. 152.) The defendant can easily replevy, which is not an appearance; or he may give bail under this section, which is as much so as the acknowledgment of service.

If the district court refuse to render judgment against the sureties, the Supreme Court will reform the judgment, and render it against all the obligors in the special bail bond.

[LINDSAY, J., dissented, and reviewed the whole subject.]

APPEAL from Bastrop. The case was tried before Hon. JOHN IRELAND, one of the district judges.

There is a motion made by Morrison to dismiss the appeal for want of jurisdiction, but as the court considered the material facts in the record, for the proper understanding of this motion it may be as well to state them.

On the 11th of October, 1865, Kennedy filed his suit in the district court of Bastrop county against Morrison to recover the sum of $5,530 11. He at the same time made an affidavit to the truth of the petition, which set forth the cause of action.

There was no revenue stamp on the petition, but one was placed on the writ of attachment.

An original citation to the defendant, Morrison, was also issued, on which there was a return by the sheriff that he had executed the writ "by leaving a certified copy of the plaintiff's petition at the defendant's house."

By virtue of these proceedings twenty bales of cotton, twenty head of mules, and four wagons, the property of Morrison, were seized upon by the sheriff. This property

the defendant regained possession of by executing a special bail bond.

There was no other service made, or attempted to be made, on Morrison of the original citation, other than the leaving of the papers at his residence.

Morrison, first in order on the day of trial, filed a motion to quash the attachment. He next filed a motion to quash the special bail bond.

The plaintiff then filed a demurrer to both the motions to quash. On this demurrer the record does not disclose any action of the court.

After the motions to quash were argued and disposed of, and the writ of attachment, levy, and bail bond quashed, the defendant called the attention of the court to the want of personal service on Morrison, as disclosed in the bill of exceptions, and moved to suspend or dismiss the case, which motion was overruled.

The plaintiff then asked and obtained leave to amend his petition, and amended the same by alleging that the defendant was justly indebted to him, and claimed interest on the amount. This was the first amendment made by the plaintiff to his petition, and was rendered necessary, no doubt, in the judgment of plaintiff, by the action of the court in sustaining the motions to quash, on the ground, among others, of the want of a sufficient allegation of indebtedness in his original petition.

After this, and next in order, the defendant filed a special exception, in the nature of a plea to the jurisdiction, on the ground that the petition showed a want of jurisdiction on its face, in that it failed clearly to disclose the residence of the parties.

This plea was at once considered by the court and sustained, and leave again given the plaintiff to amend.

He then filed his second amendment to his petition, as it appears in the record, alleging clearly and distinctly the residence and citizenship of both the plaintiff and defendant.

xxxi—14

Having filed the second amendment, and thus presented for the first time, according to the opinion of the judge below, a clear and specific averment as to the residence, that was issuable in its character, the defendant at once filed under oath his plea to the jurisdiction of the court, and "issue was joined on it." A jury was impanneled, and, the *onus* being on the defendant as holding the affirmative of the issue, he was proceeding to examine his witnesses before the jury, and had the witness F. W. Chandler on the stand, when the plaintiff asked and obtained leave of the court to file a general demurrer to the plea to the jurisdiction, and thereupon the trial of the cause was stopped by the court, the issue withdrawn from the jury, the defendant allowed time to put his demurrer in writing, and the same was then sustained by the court.

Upon this, the court having decided that the void bail bond which had just been quashed operated as an appearance for defendant, the defendant, having exhausted all modes known to him of disputing the jurisdiction of the court, filed a general denial, reserving all his former exceptions. The cause was then ordered to the jury by the court, and the result was a verdict and judgment for the plaintiff for the sum of $5,829 87, against the defendant, Morrison, alone.

The plaintiff was dissatisfied with this judgment, because it was not also at the same time rendered against the sureties on the special bail bond, which had already been quashed; he thereupon moved, at this stage, to reform the judgment, so as to include the sureties in the special bail bond, which motion the court overruled, and from this final ruling of the court the plaintiff appealed.

The appellant assigned as errors, 1st. The ruling of the court in quashing the original attachment. 2d. The ruling of the court in quashing the special bail bond. 3d. The refusal of the court to allow him to amend his affidavit for attachment. 4th. The refusal of the court to reform the

final judgment so as to include in its scope the sureties on the special bail bond.

From the final judgment in this suit the defendant also prosecuted a writ of error, and assigned the error of the court in not dismissing, or at least continuing, the case for want of jurisdiction and service after the quashal of the writ of attachment and the special bail bond.

Both cases were, by agreement, considered together.

*Hancock & West*, for Morrison.—1. Has the Supreme Court jurisdiction to entertain the appeal of Kennedy from the order of the court refusing to reform the judgment?

2. Did the court err in refusing the motion to dismiss or suspend the case for want of jurisdiction, after the attachment and bail bond were quashed?

3. Did the execution of the special bail bond operate as a waiver of all errors and irregularities in the issuance of the original attachment, and preclude the defendant from inquiring into its validity?

4. Did the court err in quashing the original attachment and special bail bond?

5. Had the plaintiff a right to file his demurrer to defendant's plea in abatement after issue joined? And, if so, was the demurrer well taken?

6. Should this case be dismissed in this court for want of jurisdiction?

I. A motion to dismiss the appeal in case No. 3038 has been made, and we believe it should be sustained, and the appeal dismissed for want of jurisdiction.

It will be observed by an examination of the appeal bond of Kennedy that he does not appeal from the final judgment, but from a merely incidental order in the case as to the reformation of the judgment. This is expressly stated to be the fact in the appeal bond.

Under article IV, section 3, constitution of 1845, (Paschal's Dig., p. 55, Note 176,) it was competent for the legis-

lature to have provided for appeals or writs of error from orders or decrees other than final judgments, had they deemed it proper to do so, but they have never exercised the power, and hence it has been frequently decided by our Supreme Court that no appeal or writ of error will lie from any mere interlocutory judgment, or for a refusal to grant a new trial, or any like motion of the class of this from which the defendant has appealed, other than such as are absolute and final in their character. (Houston v. Starr, 12 Tex., 429; Goss v. McLaurin, 17 Tex., 107; Cheatham v. Riddle, 8 Tex., 166, 10 Tex., 48; Ewing v. Kinnard, 2 Tex., 164; Byers v. Janes, 2 Tex., 530; Hancock v. Metz, 7 Tex., 177, 6 Tex., 37; Warren v. Shuman, 6 Tex., 441; Little v. Morris, 10 Tex., 260; Goss v. McLaurin, 8 Tex., 342; Scott v. Burton, 6 Tex., 322; Stewart v. Jones, 9 Tex., 469; Burrell v. The State, 16 Tex., 147; State v. Dougherty, 5 Tex., 3; State v. Paschal, 22 Tex., 584; State v. Pierce, 26 Tex., 114.)

From these authorities it is clear that no appeal can be had except from the final judgment; and, indeed, such is the language of the statute, which reads thus:

"Any party to a civil suit, believing himself aggrieved by any final judgment, &c., may appeal," &c. (Paschal's Dig., Art. 1510; O. & W. Dig., Art. 553; Hart. Dig., Art. 819.)

It will be further observed that there is no notice of appeal from the final judgment, but the notice relates solely to the ruling of the court on the motion to reform. This notice is essential to give the appellate court jurisdiction. (Burr v. Lewis, 6 Tex., 80; Lockhart v. Lockhart, 1 Tex., 199.)

The case of Messner v. Lewis, 17 Tex., 519, is in point.

In fact the appeal of the plaintiff is nothing more than an effort to amend in the Supreme Court a final judgment of the district court.

Paschal's Digest, articles 47–51, points out the proper

mode to proceed to amend judgments; the plaintiff has totally misconceived his remedy.

II. Should the motion to dismiss be sustained, it will be unnecessary to inquire into the rulings of the court in quashing the attachment and special bail bond, and the only questions remaining would be as to the ruling of the court in refusing to dismiss or continue the original suit for want of jurisdiction.

This motion was made after the quashing of the writ of attachment and special bail bond, and, there being no personal service or answer filed under the decision in Green v. Hill, 4 Tex., 465, it should have been sustained.

But the court held that the execution of the invalid special bail bond operated as an appearance.

III. If the court here should hold that, under the act of congress, (to which reference will hereafter be made,) the court below could not hear the case for want of jurisdiction, by reason of the failure of plaintiff to affix a revenue stamp to the original petition, or by reason of the want of personal service after the attachment and bail bond had been quashed, then, under the authority of the case of Roeser v. Bellmer, 7 Tex., 1, this court, instead of remanding the cause to the district court, should dismiss at Kennedy's cost, as was done in the case above cited. But should we be mistaken in our view of the law, and in the applicability of the cases of Messner v. Lewis, 17 Tex., 519, and Green v. Hill, 4 Tex., 465, then it will become necessary to consider the third point, which is to this effect:

Did the execution of the special bail bond operate as a waiver of all errors and irregularities in the issuance of the original attachment, and preclude the defendant from inquiring into its regularity or validity?

The court below decided that it did not operate as such waiver, and we are unable to perceive any good reason why it should be supposed to have that effect. It is not so de-

clared by the statute; on the contrary, the law simply states that the execution of such bond shall operate as an appearance for the defendant, (Paschal's Dig., Art. 152,) and it would seem, then, that no greater effect should be given to a bail bond than to the appearance itself. But an actual appearance and an answer to the merits, our Supreme Court has held, do not deprive a defendant of his right to move to quash an attachment. (Drake v. Brander, 8 Tex., 351.)

The point itself has been more than once passed upon, and the authorities on the subject will be found grouped in Drake on Attachment, §§ 317, 319, *et seq.*, and leave no doubt of the correctness of the ruling of the court below. The case cited from the Supreme Court of the United States (Barry v. Foyles, 1 Pet., 311) goes solely upon the ground that the appearance of defendant and giving bail prevented any further inquiry into the attachment proceedings, which is not the law in this state. (Drake v. Brander, 8 Tex., 351, where it was held that the motion to quash may be made after appearance and answer to the merits; and such is constantly the practice in this state.)

The only case cited that really is in point and militates against the position we assume is the case of Payne v. Snell, 3 Missouri, 409.

On the other hand, in the State of New York, where these matters have been much considered, the rule, as laid down by the court, has been followed, and it has been held on several occasions that the execution of the special bail bond did not waive any errors or irregularities in the issuance of the attachment. (Cadwell v. Colgate, 7 Barb., 253: Kannouse v. Dormedy, 1 Denio, 267.)

The supreme court of Louisiana has followed the decisions of the courts of New York. (Schlater v. Broadus, 3 Mart., N. S., 34; Oliver v. Gwin, 17 La., 28; Quine v. Myers, 2 Rob., 510.)

The supreme court of Arkansas has also decided the

point in the same manner.    (Childress v. Fowler, 9 Ark., 159;  Delano v. Kennedy, 5 Ark., 457.)

If, then, these decisions be followed, the defendant had a right, nowithstanding the execution of the special bail bond, to inquire into the legality of the issuance of the attachment.

IV.  "Because there was no petition filed in the court, there being no revenue stamp placed on the petition, (the petition being the commencement of a suit,) as required by the internal-revenue laws of the United States, which were passed by virtue of authority vested in the congress of the United States, and are binding upon the courts of the State of Texas, and all other states of the Union."

In this case, by an inspection of the record, it will be seen that the revenue stamp was placed neither upon the original petition nor original citation, but was affixed to the writ of attachment.    This was clearly contrary to law. The statute says the stamp "shall be affixed to the writ or other original process by which any suit is commenced." (2 Brightly's U. S. Dig., 272, § 291.)    By section 158 of the excise laws (2 Brightly's U. S. Dig., 264, § 252) any instrument, of every kind, (necessarily including writs, declarations, or petitions,) is required to be stamped, and, if not so stamped, is declared to be "invalid and of no effect."

The laws of Texas say ."that all civil suits shall be commenced by petition."    (Paschal's Dig., Art. 1425.)

V.  The statute declares that the party making the affidavit for the attachment shall state "that the defendant is justly indebted to the plaintiff, and the amount of the debt." (Paschal's Dig., Art. 142.)    An examination of the petition will show that this important allegation is wanting.

The statute requires 'that the plaintiff shall swear that the defendant is "justly indebted" in the "amount" for which he sues out his attachment.  A writ of attachment to secure $5,000 cannot issue on an affidavit that the defend-

ant is justly indebted to the plaintiff for the sum of $1,000 or $2,000.

It has been held, not only that the party must swear that the defendant is indebted in the amount claimed, but that he is "justly" indebted. A mere affidavit to the indebtedness will not be sufficient. Marshall v. Alley, 25 Tex., 342, is conclusive on this point. (Thompson v. Towson, 1 Harris & McHenry, 524; Chevallier v. Williams & Co., 2 Tex., 239; Wooster v. McGee, 1 Tex., 17; Givens v. Taylor, 6 Tex., 315; Marshall v. Alley, 25 Tex., 342.)

The quashing of the attachment naturally carried the bail bond with it, as its validity necessarily depended upon the legality of the attachment. (Cadwell v. Colgate, 7 Barb., 253.)

[The residue of the argument was on the questions of practice.]

*George W. Jones,* for Kennedy, insisted that the special bail bond amounted to an appearance, and, being good in form, the sureties became liable for the amount of the judgment.

MORRILL, C. J.—Kennedy brought suit in the district court of Bastrop county against Morrison, founded upon two promissory notes executed by Morrison to Kennedy or order, and upon an account for personal services, and another account for the use and hire of two servants. Suit was brought by attachment, which was levied, and property released on special bail. There was no personal service of the petition on defendant. On the trial the defendant moved that the attachment be quashed, because the affidavit was not made according to the requirements of the statute. The petition states the indebtedness of the defendant with sufficient certainty, giving a full statement of the causes and foundation of such indebtedness, as well as the non-payment of the same. The affidavit is that the

"facts and allegations in the petition are true and correct."
The petition nowhere states that the defendant is "justly
indebted" to plaintiff in any sum, *in hæc verba*, and because
the affidavit does not contain the word "justly," before
"indebted," defendant insisted in the district court and in
this court that the same is bad. It is a rule in pleading,
that whenever the same is doubtful or capable of two con-
structions, the one the more unfavorable to the pleader is
to be adopted, and in extraordinary proceedings the rule
shall apply with its full force and vigor. The other causes
for the extraordinary process in this case are not questioned
by the defendant, and therefore the whole is narrowed down
to the one question above mentioned, whether the affidavit
is defective because it does not state that the defendant is
"justly" indebted.

In the case of Marshall v. Alley, 25 Tex., 342, the plaintiff
in his affidavit stated that the defendant was "justly in-
debted" to him in a certain sum, but in the further state-
ment of his cause, showing the grounds of the indebtedness,
it appeared that there was really a less sum due than the
said amount, and the affidavit was deemed insufficient.

In the case of Morgan v. Johnson, 15 Tex., 568, Justice
WHEELER says: "It is objected to the judgment that the
affidavit to obtain the attachment was insufficient, because
it does not state the amount of the indebtedness. It, how-
ever, does state that the defendant is indebted to the plaintiff
in the several sums of money mentioned in the petition,
and this we think was sufficient. We are not aware that
it has ever been held to be necessary to state the sum in
the affidavit, where the sum demanded is thus expressly
and definitely stated in the petition and the party makes
oath that that sum is due."

Taking these two decisions, and giving them their proper
construction, the inference is that the pleadings of the
plaintiff in attachment, filed under oath, must show con-
clusively to the court a certain amount justly due. And

whether or not it is justly due does not depend upon the sworn statement of the party of the justness, but upon the proper allegations of the indebtedness, showing the same to be just, and this statement to be under oath, and this we conceive the plaintiff has done. · There can be no doubt that any court would, upon demurrer to the petition, decide that the defendant was "justly" indebted to plaintiff agreeably to the statement in the petition.

In the case of Livengood v. Shaw, 10 Mo., 274, the court, upon a similar case to the one at bar, said: "The affidavit alleges that the defendant is indebted, &c., omitting the word 'justly,' as prefixed in the statute to the word 'indebted.' * * * According to the common legal acceptation of the term indebted, it means justly indebted, legally indebted, indebted according to law, and the superadding of the term justly does not therefore qualify or restrict the word 'indebted.'"

Another exception of the defendant is, that the stamp was placed on the attachment instead of the petition. The papers show that the petition, affidavit, and attachment were all filed and issued at the same time.

The statute of 1862 provides as a stamp duty for every "writ or other original process by which any suit is commenced in any court of record, either law or equity, fifty cents." It is assumed by the act that a suit is commenced by a "writ or other original process," and it is believed that this is the case in most of the states. In this state the act of 13th May, 1846, says, "all civil suits in the district court shall be commenced by petition filed in the office of the clerk of the district court." [Paschal's Dig., Art. 1426.] The petition is entirely different from a writ or other process, as said process is obtained by filing the petition. The same statute provides what the style of writs shall be, and the article closes by stating that the clerk issuing any process shall mark thereon the day on which it issued. [Paschal's Dig. Art. 1431, Note 543.] It would therefore be

impracticable to fix the stamp on the process by which suit
is commenced in Texas, unless we confound terms, and call
a petition a legal process, and that cannot be done, because
the clerk never issues a petition, but files it and issues a pro-
cess consequent on filing a petition.  But when we take
into consideration the reason of the law, that it was de-
signed to raise a revenue, and that every suit in law or
equity is to be taxed fifty cents for this purpose, and that
the canceled stamp was to operate as a receipt for the pay-
ment of this tax, it would seem to be a matter of perfect
indifference whether the same be placed either upon the
petition, the affidavit, the bond, the citation, or the attach-
ment in this case.  If, as we admit, it is not free from doubt
to which of these papers the stamp should be applied, we
certainly would not be justified in charging the plaintiff
with a violation of duty, and dismiss his cause from court,
even if we should decide that the same should have been
placed upon the petition or citation.  We conceive that
the statute would be complied with if the stamp were
placed upon either of the papers, as they all appear to form
one transaction.

The defendant also objects to this court taking any juris-
diction of this case, because the plaintiff has not appealed
from a final, but, as he says, an interlocutory judgment.
If there is any one point decided and re-decided by this
court, it is that no appeal will lie from an interlocutory
judgment.  If a party were allowed to appeal from any and
every interlocutory judgment during the pendency of a
suit, and thus suspend the progress of the same during the
pendency of the appeal, it would be an easy matter for a
party unwilling to have a suit tried to have the same post-
poned indefinitely.  But we must not confound an inter-
locutory with a final judgment.  The definition of an inter-
locutory judgment is readily suggested by reverting to the
original signification of the word, that it is a judgment
between something; and, as it not unfrequently happens

that a district court enters a number of judgments between
the institution and close of a suit, such as continuances and
rulings relating to evidence, &c., as each and all of these
are entered between the institution and termination of a
suit they are called interlocutory judgments.   The word
final, signifying last, is of course the last judgment that
the district court enters in a cause, and it is from this
judgment that an appeal lies.   To apply these facts to the
case at bar, when the judge entered up judgment against
the defendant, only the plaintiff requested that the sureties
on the bail bond of defendant be included in the same.
This request had no reference to any interlocutory judg-
ment in this case, and there were many, but to the final
judgment; and, because the plaintiff was denied in his
request to have such a final judgment as he wished, he
gave notice of appeal, and in fact it is the only change that
the plaintiff seeks in the proceedings, since he obtained the
amount of the judgment he sued for.   In appealing from
the final or last judgment that was rendered in the cause,
whether that judgment should be the adjudication of the
court that the defendant go hence, &c., or that the plaintiff
have and recover, &c., or that a new trial be granted or
refused to a party applying for the same, in either of these
cases the last judgment appealed from brings up, for the
revision of this court, all of the previous proceedings or
interlocutory judgments; and we now come to the final
judgment, and the only question at issue on this point is,
whether the judgment should have been rendered against
all the obligors in the bail bond.

Upon the levy of the attachment the defendant had the
option of the two courses to have his property released
therefrom.   Article 150, Paschal's Digest, provides, in sub-
stance, that the defendant shall have the right to replevy the
property by giving bond with sureties for the amount of the
debt or the value of the property, as he may choose, con-
ditioned that he return the specific property in case he be

unsuccessful in the suit. Article 152 provides, that the defendant may at any time before final judgment, upon giving special bail, with good and sufficient sureties for the amount of the debt and interest, recover possession of the property so attached from the person in whose hands it may be; but the giving such special bail shall be deemed an appearance of the defendant, and the suit shall thereupon proceed as in ordinary cases; but, if the plaintiff recover, he shall have judgment against all the obligors in the bail bond. In this case the defendant chose to give the special bail bond, and in so doing he assumed all the consequences. Had he simply replevied the property, he would not necessarily have, *ipso facto*, acknowledged service of the petition; but by giving special bail he agreed to acknowledge service of the petition and let the cause proceed as if the attachment had not issued, and he and his sureties further agreed, that whatever judgment should be entered against the defendant should be entered against all the obligors of the bond.

This court therefore, proceeding to render such a judgment as the district court should have rendered, because it seems to this court that the district court erred in not rendering judgment against said W. G. Kennedy and his sureties on the bail bond, viz, J. D. Nash and A. W. Moore, it is ordered that said judgment be set aside and reversed, and the judgment be entered against said Kennedy, Nash, and Moore.

ORDERED ACCORDINGLY.

LINDSAY, J., dissenting.—In this case I must dissent from the opinion of the court delivered by the chief justice.

To give clearly and intelligibly the view which I entertain of the law applicable to the case, it becomes necessary to present a full statement of the facts as they appear in the pleadings and proceedings in the cause.

To the spring term of the district court, 1866, for Bastrop

county, the appellant, W. G. Kennedy, instituted his suit in said court against the appellee, C. H. Morrison, upon two several promissory notes, bearing date respectively on the 23d of January and the 26th of February, 1863; the first for the sum of $2,886 75, and the second for the sum of $420 87, each due one day after date, and bearing eight *per centum* interest, and upon two open accounts, one for the sum of $1,250, for the services of the plaintiff as overseer in the year 1863, and the other for the sum of $250, for the hire of two slaves for the year 1863. The petition, in the usual form, states that these several demands are still due and owing, and the defendant, though often requested, has not paid them, nor any part of them. The petition further alleges, that the defendant "is about to remove out of the state, and that the attachment is not sued out for the purpose of injuring or harassing the defendant." This last allegation is the foundation of the plaintiff's right to the attachment, and the cause for which the attachment was issued.

The petition of the plaintiff, filed in the clerk's office October 11, 1865, states that "the plaintiff, of the county of Bastrop, in the State of Texas, complains of C. H. Morrison, of said county," and then proceeds to set forth the cause of action and the ground for the attachment. This is the only allegation in the original petition of residence of either plaintiff or defendant. The petition was sworn to on the day of its filing, and there was no separate affidavit for the obtension [obtaining?] of the writ of attachment. This, too, is the only averment in the petition to show that the court had the right to acquire jurisdiction over the person or the property of the defendant by issuing its appropriate process to establish its judicial authority over the cause of action.

The bond was executed by the plaintiff in conformity with the requirements of the statute, and citation and the writ of attachment were issued by the clerk, as the law

requires, and on the same day of the filing of the petition. The citation was returned by the sheriff on the 13th of October, 1865, with the following indorsement:

"Came to hand October 12, 1865, and executed October 13, 1865, by leaving a certified copy of this citation, with a certified copy of plaintiff's petition, at the house of C. H. Morrison.    Returned October 23, 1865.

JAMES B. COPE,
"*Sheriff Bastrop county.*"

A mode of service unknown to our statutes or practice. The attachment was levied upon certain property, in regard to which the sheriff made the following return:

"Came to hand October 12, 1865, and executed October 18, 1865, by levying upon the following property of C. H. Morrison, in the presence of Thomas J. Hill, viz: twenty bales of cotton, twenty head of mules, and four wagons. Returned October 19, 1865.          JAMES B. COPE,
"*Sheriff of Bastrop county.*"

On the 21st of July, 1866, nine months after the levy of the attachment, the defendant, C. H. Morrison, with Thomas J. Hill and William Coats as his sureties, executed and delivered to the sheriff what is called a special bail bond for double the amount of the debt and demand sued for, which bond was approved by the sheriff, and returned and filed in the office on the said 21st day of July, 1866, the bond being for the sum of $11,064 22, while the debt or demand was only $5,532 11.

On the 13th of December, 1868, the attorneys for the defendant, Morrison, entered and filed a motion to quash the attachment in the case, with a *protestando* against the jurisdiction of the court, and on the same day entered and filed another motion to quash the special bail bond, with a like protest against the jurisdiction over the cause of action.     The reasons assigned for the first motion were insufficiency of the petition, the want of a revenue stamp upon it as the initial proceeding, defectiveness and.

informality of the affidavit, and that the bail bond was not taken according to law. Those assigned for the second motion were, in substance, that the bond was taken by the officer when he had no authority to take it; that it was excessive and unreasonable in amount; the condition illegal and defective; it did not follow the statute; that, there being no revenue stamp upon the petition, there was no cause in court to warrant an attachment, and that no sufficient ground was sworn to authorize its issuance. Both motions for quashing the attachment and the bail bond were sustained by the court below, after leave being granted the plaintiff to make two several amendments to his petition, reaffirming the indebtedness of the defendant, as charged in the original petition in the one, and charging in the other that both the plaintiff and defendant were resident citizens of Bastrop county at the time of suing out the attachment. The defendant had, however, already filed an exception and plea to the jurisdiction, upon the ground that the petition did not disclose that either the plaintiff or defendant was a resident of Bastrop county. There was a demurrer filed by the plaintiff's attorney to each of the motions to quash, each of which was overruled. Leave was then had to amend, the amendments made, as above stated, and filed. The defendant thereupon filed his sworn plea in abatement, denying his residence in the county at the time of the emanation of the attachment, and averring his residence was at that time, and before and since, in the State of Louisiana, and is not now nor ever has been in the county of Bastrop, and therefore objecting to the jurisdiction of the court. The plaintiff filed exceptions and a demurrer to the defendant's sworn plea in abatement to the jurisdiction. Upon this state of pleadings the court adjudged that the motion to quash the attachment and the bail bond be sustained, and the motion of the defendant, then made, to dismiss the case for the want of service of process and the want of jurisdiction was overruled, and the

exceptions and demurrer to the plea of want of jurisdiction were sustained; and thereupon a jury was sworn, tried the case, and brought in a verdict against the defendant for the sum of $5,829 87—$297 76 more than was claimed in the attachment and the affidavit upon which it was sued out. Upon this verdict of the jury the court rendered a judgment for the amount so found by them, with legal interest from the date of the judgment until paid. From this judgment of the court the defendant prayed an appeal. The plaintiff afterwards filed his motion to reform the judgment of the court, but the court overruled the motion, and from this ruling of the court the plaintiff took an appeal.

It further appears in the proceedings, by bill of exceptions taken by defendant, that after the attachment and bail bond were quashed objection was taken by defendant's attorneys to the want of service of process upon the defendant and the want of power in the court to try until such service was had. Furthermore, that after the special exceptions to the plaintiff's petition were sustained by the court, and the parties had announced themselves as ready for trial on the plea to the jurisdiction, and the defendant had had a witness sworn, and commenced his examination, the plaintiff asked leave to file a demurrer to the plea to the jurisdiction, which leave, though objected to by defendant's attorneys, was granted, the demurrer filed, and sustained by the court.

The object of the plaintiff's motion to reform the judgment was to have the judgment rendered as well against the sureties, in the bail bond as against the defendant in the action.

Such, in brief, are the prominent and important parts of the pleadings and proceedings in the court below, and which are the only matters necessary, in my judgment, for a full and intelligible comprehension of the principles of law applicable to the case. I have been thus comparatively minute in their presentation, that there may be no misap-

prehension of the view I take of the nature and character
of the attachment law of the State of Texas, which differs
in some essential particulars from the attachment laws of
the other states of the Union, as theirs also differ among
themselves.    Upon a comparison of those various laws
there will be found a marked and well-defined difference;
and there can scarcely be found any approximation to sim-
ilarity in any of their features, save in the single instance
of the identity of some of the grounds for attachment
which will be observed to exist in many of them.    But
their modes of proceeding under them are essentially vari-
ant, and their judicial decisions afford us little aid and
facility in this regard in the interpretation of our own.
True it is, that many of their eminent and distinguished
jurists, in their well-considered and matured opinions, may
and do enlighten us in the general principles of law appli-
cable to the construction and interpretation of all legisla-
tive enactments; but, in expounding their own attachment
laws, they are controlled by their peculiar provisions, and,
the minds of the judges being necessarily impressed with
the full import of the entire statutes of their several states,
must be modified by those peculiarities, and their reason-
ings and conclusions will inevitably be affected by them.
As guides and precedents, therefore, to direct us in the true
interpretation of our own statutes, they are consequently
unsafe; and what is not already settled by our own court
must still be regarded as *res integra;* and this court is left
to settle each new point which may arise under them
according to the special facts of each case, with whatever
of enlightened wisdom it may possess of the general prin-
ciples of judicial interpretation.

The attachment laws of this country are emphatically
the creations of the statutes of the several states.    They
have no foundation in general customs, which are the usual
sources of the remedies for injuries to person and property.
Originating, as we are told, in the particular customs of a

single city, as extraordinary remedies, and as merely sub-
sidiary to the usual civil remedies of the common law, the
legislatures of the different states have given their sanction
to the main principles established by those particular cus-
toms, by engrafting them into our system of jurisprudence
as necessary auxiliaries in the successful enforcement of
our common-law rights.    But beyond the letter of those
enactments, and a clear and explicit manifestation of the
legislative will in framing them, we are not warranted in
going in our interpretation of them. What, then, was the
general purpose and object of the legislature of this state,
as well as the legislatures of the several states, in enacting
the attachment laws?    Obviously, it was to afford the citi-
zens of the state an additional and auxiliary remedy against
certain classes of debtors, for the better security and en-
forcement of their rights, which the common-law remedies
were inadequate to fulfill.    In this state it was to furnish
a remedy to citizen creditors against four different classes
of debtors: First, non-resident debtors, having property in
the state; second, absent, absconding, and concealed debt-
ors, upon whom the ordinary process of law cannot be
served; third, debtors about to leave the county or state,
without satisfying and discharging their contracts or mon-
eyed obligations; and, fourth, fraudulent debtors, who may
be endeavoring to secrete or transfer, or who have secreted
or transferred, their property to defraud their creditors.

Of these four classes of debtors, subject to the attach-
ment law, it could never be in the contemplation of the
law-giver that the first class were, or ever could be, while
they were non-resident, liable to personal service, and could
thus be drawn within and made subject to the jurisdiction
of its courts.    Such a conception would violate a funda-
mental principle of our political system.    It would be an
attempt to make the laws of a state operate extra-territo-
rially, and be in direct contravention of a well-known and
universally-acknowledged principle of our civil jurispru-

dence.   The jurisdiction of our courts cannot be extended
by any device or contrivance, directly or indirectly, by any
artful legislation, so as to bring the citizens of other states
personally under the jurisdiction of our own courts.   The
local jurisdiction of our courts may attach and be acquired
by proper process over the property of non-residents within
the territorial limits of their local jurisdiction.  And when
the statutory authority is correctly observed and followed
the courts can make such disposition of the property under
the statute as the rights of the creditor may demand.   In
regard to the other three classes of debtors, the creditor
may proceed by what has been called, in the language
of this court, in the case of Cloud v. Smith, 1 Tex., 611,
double process; that is, by attachment against the property
and citation against the person.   These are all presumed
to owe allegiance to the state, and either are, or once were,
residents of the state; and, nothing else appearing, the pre-
sumption must be indulged, even as to the absent ones,
that they left *animo revertendi.*  This is a legal presumption.
If the absent debtor should return, or the absconding and
concealed debtor unkennel himself, so to speak, or should
the creditor have an opportunity of getting a citation served
upon the departing debtor from the county or state before
he escapes, or should he be able to find the fraudulent
debtor who is secreting and transferring, or who has se-
creted and transferred, his property, and he should wish a
personal judgment, rather than a mere judgment against
the property attached, founded upon notice by publication
alone, which may be inadequate to satisfy his demand, in
all these three last classes of cases the creditor has a right
to proceed by what has been very appropriately denomi-
nated by the distinguished jurist who delivered the opinion
in the case of Cloud v. Smith, already adverted to, a double
process, at any time before final judgment; or such debtors
themselves may, at any time before final judgment, get the
property so attached by the creditor released by executing

a special bail bond for the value of the property, or for the amount of the debt and interest, which bail bond will operate under the statute as an appearance of the defendant, and which, under such state of case, would warrant a personal judgment against the debtor. This is the proper classification, I am satisfied, of debtors liable to attachment under the laws of Texas, and a correct method of proceeding under those laws, as prescribed by the statute itself, for acquiring jurisdiction over the persons of the debtors of the three last classes. If the jurisdiction over the person is not thus acquired by actual service of the citation, or by the execution of the bail bond by resident debtors, just as the statute prescribes, there can be no personal judgment against the resident debtor, and the court can go no further than to render a judgment for the sale of the property attached, and to appropriate the proceeds of the sale to the satisfaction of the demand: Provided, however, that due publication has been made, warning the non-appearing debtor. Without this publication against the non-appearing resident debtor the judgment against the property attached is a nullity, because there is no warrant in the law for it. Without actual citation or publication the statute imperatively declares that "no judgment shall be rendered in any case of attachment, unless citation or summons has been served in the ordinary mode, or by publication in the manner provided by law." This legal inhibition is not only a part of the attachment law itself, but it is reiterated in the district court act, defining the powers and duties of that court, and prescribing the mode of proceeding for the enforcement of civil rights. This being the case in regard to resident debtors, I can neither appreciate the philosophy nor find the legislative authority for applying a different and a more stringent rule to non-resident debtors, and, by indirection, acquiring a jurisdiction over them not warranted by the fundamental principles of our political system, and giving personal judgments against them, and

that, even, without process served upon them. In the case under consideration, the judgment of the court below is a judgment *in personam*, and not a judgment *in rem*. Had it been a judgment of the latter kind, it would have been valid against the property attached, whether of resident or non-resident debtors: Provided that citation had been duly served or due order of publication made.

The vital point in this case, as developed by the pleadings and proceedings in the court below, is the question of jurisdiction of the court, and its legal authority to render a personal judgment against a non-resident debtor, which would, by any comity of nations or states, be regarded by the tribunals of other countries as binding on the party. It is a grave question, and has not been directly adjudicated in this state, nor, so far as I know, has it even been determined in any of the other states of the Union. In this particular case, if the court had jurisdiction of the person, then the judgment might not be invalid, though it might be voidable, and subject to correction by motion in the court below, or to reversal in this court, for an irregular or wrongful exercise of the power of the court. But if the court had neither acquired nor could acquire jurisdiction over the person of a resident citizen in another nation or state, then this personal judgment is absolutely void.

This involves an inquiry into the nature and character of the jurisdiction of the common-law courts of our country, so far as the enforcement of civil rights is concerned. I take it there is a marked distinction between the civil and criminal jurisdiction of our courts. The latter is founded upon the essential principles of social justice and social security. It is the nature, the character, and the extent of civil jurisdiction which I purpose briefly to investigate, and which naturally arise out of the pleadings and proceedings in the cause now under consideration.

"The term jurisdiction, in its judicial sense, has a twofold signification. It is either local, which expresses the

territorial limits in which the power of the court may be exercised, or it is potential, which means simply the legal power or authority which it possesses of executing the laws and distributing justice within the local limits to which it is restricted by the law-making or political power of the state."

It is the law alone which gives jurisdiction, whether local or potential. It cannot be conferred by any mere acts or consent of parties. The court upon which this potential jurisdiction is conferred by law must acquire its local jurisdiction by such process as is authorized by law. One of two things must exist, and is indispensable in the local jurisdiction to authorize the court to acquire this potential jurisdiction : either the person or the property of some defendant, the actual residence of the person, or what is called the *forum domicilii*, or the presence of property within the local jurisdiction, called the *forum rei sitæ*. There is such a thing, too, as legislative jurisdiction. Its power and authority, also, is confined within its territorial limits. Justice STORY lays down the proposition, in his Conflict of Laws, that "No sovereignty can extend its process beyond its territorial limits, to subject either persons or property to its judicial decisions. Every exertion of authority of this sort beyond this limit is a mere nullity, and incapable of binding such persons or property in any other tribunal." If no sovereignty can do this directly, surely it cannot accomplish it by any indirection, because it would be in fraud of a great international principle. To acquire jurisdiction over a person, (who is not a citizen of the state, but who may be temporarily within the local jurisdiction of the court,) the court must make him a party by its own process by service, and it cannot acquire it by any proceedings *in invitum*, nor can the legislature confer the power on the courts to do so, because the state has no claim upon the allegiance of such non-resident or foreigner.

Lord ELLENBOROUGH, in an opinion pronounced in an

English court, and quoted by Justice STORY in his treatise above referred to, in the case of a judgment in the Island of Tobago, rendered against a citizen of London, according to the local law of constructive service on said island, uses this language:

"By persons absent from the island, must necessarily be understood persons who have been present and within the jurisdiction, so as to have been subject to the process of the court; but it can never be applied to a person who, for aught that appears, never was within or subject to the jurisdiction. Supposing, however, that the act (of Tobago) had said in terms, that though a person sued in the island had never been present within the jurisdiction, yet that it should bind him upon proof of nailing up the summons on the court-house door; how could that be obligatory upon the subjects of other countries? Can the Island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such assumed jurisdiction? The law itself, however, fairly construed, does not warrant such an inference; for 'absent from the island' must be taken only to apply to persons who had been present there, and were subject to the jurisdiction of the court out of which the process issued; and, as nothing of that sort was in proof here to show that the defendant was subject to the jurisdiction at the time of commencing the suit, there was no foundation for raising an assumpsit in law upon the judgment so obtained."

And this doctrine, says Justice STORY, has been fully recognized in the American courts. In this opinion it is clearly manifest that all legislative action conferring power upon the courts to render judgments against resident citizens of another state, without service of process, or an unforced answer to the merits of the suit, is rejected and repudiated by the most enlightened jurists of England and America.

Certainly the legislature of this state may enact any laws

not repugnant to the federal and state constitutions and the laws passed by the federal government in pursuance of that constitution, and they will be binding and obligatory upon the persons of its own citizens; and it may pass any law affecting the property of the citizens of the other states, situated within the limits of this state, under like limitations. But the right to draw to our courts civil jurisdiction over their persons without the actual service of process, or their voluntary appearance as defendants and submission to a jurisdiction already acquired over property by virtue of its location within the local jurisdiction and a levy upon it by legal process, finds no warrant in the civil jurisprudence of this country, or of any other where the common law obtains. It will not justify the rendition of a personal judgment against a foreigner or non-resident citizen *in invitum*. It is conceded by all enlightened authors upon public law that the authority, to foreigners or non-residents, · to institute and carry on suits in the domestic forum is a matter of grace, of favor, and is based alone on the comity of nations, which may also be denied by the justice of nations. Hence, I conclude that if our courts here do acquire jurisdiction over the persons of foreigners, or of resident citizens of other states, they must at least acquire it by the methods prescribed by the general law or customs regulating the comity of nations. In regard to the citizens of the domestic forum the rule is different. The right of jurisdiction, or the *forum domicilii*, always applies to its own citizenship. But actual acquisition of jurisdiction in a given case, even as to them, can only be obtained by process. Publication even is not process, but a mere constructive notice to the party, and is not an acquisition of jurisdiction over the person. In all such cases the jurisdiction which the court can exercise is simply a jurisdiction over the thing captured, seized, or levied upon under some other legal and appropriate process. That thing called the comity of nations, in its exposition by our courts,

cannot draw to them the right of jurisdiction over the persons of non-residents and foreigners without the actual service of process upon them while within the local jurisdiction of the courts. A judgment *in personam*, thus rendered without process, would not, out of the limits of the state where rendered, in the forcible language of Lord ELLENBOROUGH, "raise an assumpsit in law upon the judgment so obtained." If foreign tribunals would not regard such a judgment as binding, the attempt to establish such a principle of judicial action would tend strongly to overthrow and destroy all comity between states, and very soon, *ex justicia gentium*, it would not be tolerated, but totally denied, among all the states.

Testing this case by the doctrine and principles already indicated, I cannot understand the reason, nor appreciate the legal logical deductions, which brought about the conclusion to sustain the plaintiff's demurrer to the defendant's plea to the jurisdiction. I am fully aware of the decision of this court, reported in 1 Tex., in which it was adjudged, that the allegations contained in an affidavit for attachment were not traversable. For the resident citizens in the local jurisdiction, over whom the potential jurisdiction for administrative justice always exists and is never in abeyance, this principle of law is, perhaps, properly announced by the distinguished jurist who delivered that opinion. Resident citizens are concluded by everything which may be done in conformity with the statute. And such was the character of the case of Cloud v. Smith, 1 Tex., 611, to which I have alluded. But the point now raised in the case under consideration is as to the power of the court over non-residents, or citizens of another state, derivable from our statutes of attachment. This point has never been decided by this court, so far as I can discover, nor do I believe it has ever been adjudicated in any of the other states, because, no doubt, precisely such a state of pleading and disclosure by the proceedings has perhaps never occurred in the judicial

action of any of the courts. The demurrer admits the truth of the facts pleaded. If these facts were true, (and whether true or not the plaintiff is concluded as to their truth by the demurrer,) then the defendant was a resident citizen of Louisiana at the time of the issuance of the attachment. If so, what becomes of the jurisdiction of the court over his person. This plea to the jurisdiction went to the whole cause of action and all its incidents. It was an allegation in fact that the court had not acquired jurisdiction over the person of the defendant, because no process had been served upon him, and therefore no judgment ought to be rendered against him. The execution of a bond to recapture or regain his property cannot be made an appearance in him; because, being non-resident, the law of Texas had no authority to direct him in the mode of securing his own, while it is fully conceded that the court had the right to control the property attached by its absolute will. Nothing was voluntarily done by the defendant, neither the execution of the bond nor the pleading to the jurisdiction. Each of those acts was an appearance in common parlance, but not in legal acceptation. But both were appearances under moral duress; and neither can be regarded as such an appearance as to confer jurisdiction. An appearance to plead to the jurisdiction does not confer jurisdiction—cannot confer jurisdiction over the person; and if a party so appears before service of process, and puts in a plea to the jurisdiction, and the plea should not be sustained, and then departs the court without process served, a judgment upon the merits, even in the case of a resident citizen, would be a nullity; because, though the potential jurisdiction of the court over the person of the defendant exists, by reason of his residence in the local jurisdiction, as established by the political power of the state, yet the jurisdiction has not been acquired by its legal process. Surely, too, the execution of a bond to regain his property, when he could get it in no other way, while the

court had no local jurisdiction of his person, can be considered in no other light than as a bond obtained under duress; and, being invalid as a statutory bond because not executed as the statute requires, if it were sought to be enforced as a common-law bond the obligors might impeach it in equity for the manner of its obtension [being obtained?] and the injustice and iniquity of the sum, which had been suddenly duplicated by some strange species of legal legerdemain. The mere execution of such a bond by a nonresident cannot be made to operate as an appearance. And both his plea and the bond to regain his property were only modes adopted to contest the right of a foreign tribunal to adjudicate upon his personal rights. As before remarked, the power and authority of the court over the property was absolute. Over his person, in a civil action, there was no jurisdiction—it is beyond legislative jurisdiction; and the courts derive theirs through and by legislative power. The courts, then, cannot exercise it without seemingly legitimating the obnoxious maxim, "Stand and deliver; your money or your life." I cannot give my assent to any principle of administrative justice which may have that seeming, and may be perverted and oppressively employed; nor, with my view of the law, do I consider that I am called upon to give it.

If it be true, as the demurrer admits, it would seem that both the plaintiff and defendant were residents of the State of Louisiana, for the nature of the alleged indebtedness and the considerations upon which it was founded, as shown by the original petition, indicate that, at the time the liability accrued, they were then in that state, and the presumption is that they so remained, unless that presumption is rebutted by some allegation in the pleading. The only allegation in the original petition rebutting that presumption is the statement that they were of the county of Bastrop, State of Texas. On this point, however, I suppose we are concluded by the decision in 7 Tex., which recog-

nizes such a statement as a sufficient allegation of the residence of the parties. But it may readily be conceived that the parties might be of a county and state, at a particular time and when a particular transaction takes place, without being residents of that county and state. And certainly our statute requires that the petition "shall set forth clearly the names of the parties and their residence." At all events, the issue tendered by the plea ought to have been tried by the court. If they were both non-residents, the action, being transitory according to the common law, might be maintained in our courts upon the actual service of process in the local jurisdiction. But according to our law our own citizens must be sued in the local jurisdiction of their residence, unless they be transient persons; and there is no allegation in the petition that the defendant was a transient person, to give the court potential jurisdiction over him. And yet, without authority of law, this jurisdiction is assumed, in rendering a personal judgment against him; and it is now sought to obtain a judgment against the sureties on a bail bond executed for double the alleged value of the property and of the demand claimed, a bond nowhere authorized by the statute. If it be true that the defendant in the action was and now is a non-resident, how is it to be enforced or carried into execution? No execution can issue to the state of his residence. Will an authenticated copy of the judgment be taken there and suit instituted upon it? If he there pleads the want of jurisdiction in this court to render such a judgment, how will it be treated by that court? Evidently it would decide, that such a judgment does not even raise an assumpsit in law, and it would be dismissed. What then becomes of the comity of nations or states? Comity will not aid such a judgment.

The bail bond is not such a one as the statute prescribes. It is well settled by adjudications in nearly all the states that the attacking creditor, in a resort to this harsh and

extraordinary remedy, should be compelled to pursue in all things the requirements of the statute. The statute requires no such bond as this, for double the amount of the debt demanded and of the value of the property attached. If the statute does not require it, then it is no statutory bond. Can it be contended that it may be treated as a common-law bond, because he, the defendant, thereby got possession of the property? If the law did not allow it, it was the fault of the officer who took the bond and approved the surety. Suppose it were treated as a common-law bond, what would be the criterion of recovery? The amount "nominated in the bond;". no more, no less. What statute or principle, in law or equity, would authorize the court to scale it, or to modify and reduce it? The only possible plea the defendant could set up would be the equitable defense that the bond was obtained without authority of law and under duress, and defeat the entire recovery.

With this view of the case, to my mind it is clear that the judgment of the court below, on the original cause of action, ought to be reversed. I am also satisfied, in my own mind, that the judgment was right in quashing the bail bond, because it was not such bond as the statute requires. I am further of opinion that the court erred in quashing the attachment solely upon the authority of the opinion in 7 Tex. Under that decision, of the sufficiency of such an allegation of residence, the plaintiff had a right to his attachment upon the ground stated in his petition and sworn to. The court, by its process, had got the property into the custody of the law, where it ought to have been kept until final judgment. And if the plaintiff was mistaken in the actual residence of the defendant, it was his misfortune, for which the law is not responsible. And if, by reason of such mistake, the property was suffered to slip or escape from the custody of the law, when the law did not require it to be thus let loose—as our laws are not

enacted for the benefit of non-residents or foreigners—it is but one of those misfortunes incident to all human transactions. And now to make the resident sureties meet the liability would not exhibit the usual favor which our laws manifest toward that class of obligors. Law, however, is not made or enacted to repair misfortunes, but to redress injuries, exactly in accordance with its own mode of appointment, and none other.