LEONARD BRIGHTMAN *et als. vs.* INHABITANTS OF BRISTOL.

Lincoln, 1875.—August 31, 1876.

*Nuisance. Municipal corporations.*

When an erection itself constitutes a nuisance as a building in a public street obstructing its safe passage, its removal or destruction may be necessary for the abatement of such nuisance.

When the nuisance consists in the wrongful use of a building harmless in itself, the remedy is to stop the use.

When the act done or the thing complained of is only a nuisance by reason of its location and not in and of itself, the court will not order the destruction of what constitutes the nuisance but will require its removal or cause its use, so far as such use is a nuisance, to cease.

A stationary engine, though declared in certain conditions to be a nuisance by R. S., c. 17, § 17, is within the protection of the law, and if adjudged to be a nuisance by a court of law, is to be removed as provided by § 20, at the expense of the owner; but no law sanctions its destruction by a mob.

Buildings, the erection of which under conditions is prohibited by R. S., c. 17, § 5, are still, not being nuisances *per se*, within the protection of the law, and when destroyed by a mob, the town is liable to indemnify the owner for three-fourths the loss or injury sustained, he being himself within the provisions of R. S., c. 123, §§ 7 and 8.

In a suit against a town for indemnity for injury to property destroyed by a mob under R. S., c. 123, §§ 7 and 8, an instruction to the jury that it was the duty of the plaintiffs to satisfy them that they used all reasonable diligence to discover the offenders was *held* unobjectionable.

So, in such suit, evidence to show the property injured or destroyed was a nuisance, it not being a nuisance in and of itself, is not admissible as showing or tending to show contributory negligence on the part of the plaintiffs.

An instruction that the measure of damages was three-fourths of the actual value of the property at the time it was destroyed is the true rule as to damages.

ON EXCEPTIONS.

CASE, under R. S. 1857, c. 123, § 8, for three-fourths of the value

of a porgy oil factory situated in Bristol alleged to have been destroyed by a mob, April 29, 1868.

The plea was not guilty. At the trial at the October term, 1871, it appeared that the plaintiffs built the buildings in question, were in the occupancy of them at the time of their destruction, and had been occupying them for some time previous, under a claim of ownership not seriously questioned. The factory consisted of three buildings, containing the machinery and apparatus thereto affixed, as follows: one steam engine, two boilers, and piping, eight cooking tanks, four skimming tanks, two steaming tanks, seven cooling tanks, two store tanks, and the shafting and machinery necessary to said engine, one porgy press, and two curbs.

John Carter, a watchman employed by the plaintiffs, testified to the manner of the destruction; that he watched from the last of March, 1868, to October; that at the time the factory was burned, April 29, 1868, he was on his guard armed with a common musket loaded and had another gun at the watch house near by; that between twelve and one o'clock, a starlight night, he saw a boat with five men approaching; he hailed, they answered; that he forbade their landing, but they did land, disarmed him, and led him away; that three of the number guarded him; that six other boats with some thirty or more men in all, armed with guns, landed and in a short time the factory was on fire and consumed; that most of the men left in boats as they came, before the fire had made any considerable progress; that his keepers then left; that his gun was missing; that the nearest building was a quarter of a mile away, occupied by women and children; that it was twice that distance to a house occupied by men.

The defendants' counsel offered to prove, by the plaintiff Brightman and others, the strong and offensive odors arising from the factory, to show that it was a public nuisance, and a nuisance to the people residing in the vicinity; but all evidence to show the factory a nuisance was excluded.

There was evidence on both sides tending to show that there was a strong prejudice and hostility against porgy factories existing among a large portion of the community round about.

Upon this point, Brightman testified : "I did not know there was a strong popular feeling against my works prior to the fire. I heard a flying rumor against factories. I did not understand there was any particular hostility to me."

After introducing evidence for the purpose of showing the destruction of the factory and machinery, the plaintiffs introduced evidence tending to show that they used reasonable diligence to procure the conviction of the offenders ; that they exerted themselves for that purpose, and employed one Moses Sargent of Boston, a professional detective, and others, to work for the same purpose ; and that all the facts discovered tending to show the guilt of any party or parties were communicated to Henry Farrington, who was then county attorney, and that Benjamin F. Brightman, one of the plaintiffs held himself in readiness to go before the grand jury, at the request of the county attorney, but was not requested to do so and was informed by the county attorney that he need not appear unless notified that he was wanted.

The defendants requested the court to instruct the jury :

I. That if the plaintiffs erected and maintained their factory, with a stationary steam engine, without a license therefor from the municipal officers of the town of Bristol, and used the said engine for operating their works, it was a common nuisance.

II. That if the said factory was operated by the plaintiffs in such manner as to make it a common nuisance, and was a common nuisance, and such character of the factory caused or contributed to the destruction of the property in the manner alleged, the plaintiffs cannot recover.

III. The plaintiffs must use all reasonable diligence in good faith, and for the real purpose of convicting the offenders, and not merely for the purpose of laying the foundation of their action against the town for damages.

IV. That it was the duty of the plaintiffs to furnish to the municipal officers of the town, on request, such evidence as they had discovered, to the end that they might know the offenders and have an opportunity to bring their action against them.

V. That if the plaintiffs were maintaining their factory with their stationary steam engine without license therefor, they were

without legal right so to do; and if they are entitled to recover at all, the measure of damages is three-fourths of the actual value of the property, and not three-fourths of what it might be worth for such use, at that place, if they had legal right to so use it.

The first and second requests were not given, and the presiding judge gave no instructions on those points, but excluded them from the consideration of the jury. The third request was given as qualified herein; the fourth was not given; and as to the fifth, the first part was not given, but the jury were instructed that if they found for the plaintiffs, the measure of damages was three-fourths of the actual value of the property at the time it was destroyed.

The court instructed the jury that it was the duty of the plaintiffs to satisfy them that they used all reasonable diligence to discover the offenders. It was not a question of success or want of success in doing so; but if the plaintiffs used due diligence in discovering and procuring evidence to show who the guilty parties were, in good faith, and for the purpose of convicting them, and communicated such evidence and facts as they discovered, or were known to them, to the officer whose duty it was to prosecute, and were ready to act under and follow his directions, and did so act, that was sufficient, even though they never made complaint to the grand jury.

The jury returned a verdict for the plaintiffs for $3119.90, and the defendants alleged exceptions.

*J. Baker*, for the defendants.

*A. P. Gould & J. E. Moore*, for the plaintiffs.

APPLETON, C. J. This is an action on the case under R. S. 1857, c. 123, § 8, to recover three-fourths of the value of a porgy oil factory, alleged to have been burnt and destroyed by a mob, on 29th April, 1868. A verdict was rendered in favor of the plaintiffs, and the case comes before us upon exceptions to the rulings of the presiding justice.

I. The defendants' counsel offered to show that strong and offensive odors arose from the plaintiffs' factory, and that it was a

public nuisance, and a nuisance to those residing in its vicinity, but all evidence to show the factory a nuisance was excluded.

It may be conceded that the factory is a nuisance within the provisions of R. S. 1857, c. 17, § 1, and that the noxious exhalations, offensive smells and stench arising from its operations approximate to the unbearable. But the manufacture is not, in and of itself, unlawful. It is not prohibited. It is sanctioned, if carried on in a place which has been duly assigned for such manufacture. The statute does not require the destruction of the buildings or of the machinery used in its operations, but that the business should not be carried on at a place, where from its location it would be a nuisance. The statute, giving the power of abatement after conviction upon due process, does not in addition confer upon an irresponsible public the right to enforce the penalties it establishes, without process of law. A lawful business may so be carried on as to become a nuisance. Undoubtedly in certain cases and under certain limitations, nuisances may be abated by those specially aggrieved thereby. But when the subject matter of complaint is lawful *per se,* and the nuisance consists not in the business itself, but in the unsuitable place in which it is carried on, its abatement must be by the judgment of the court, and by the officers of the law carrying into effect such judgment, and not by the blind fury of a tumultuous mob. Only so much must be abated as constitutes the nuisance. If it consists in the use of a building, such use must be prohibited and punished. If the location is what constitutes the nuisance, it must be removed. A smith's forge, in *Bradley* v. *Gill,* Lutw., [29.]; a tobacco mill in *Jones* v. *Powell,* Hut., 136; a manufactory for spirits of sulphur, in *White's case,* 1 Burr., 333; a distillery, in *Smith* v. *McConathy,* 11 Miss., 517; a slaughter house in *Brady* v. *Weeks,* 3 Barb., 157; a livery stable, in *Coker* v. *Birge,* 10 Geo., 336; a melting house in *Peck* v. *Elder,* 3 Sandf., 126; a gaming house or grog shop, in *State* v. *Paul,* 5 R. I., 185; a powder magazine, in *Cheatham* v. *Shearon,* 1 Swan, 213; a blacksmith shop, in *Norcross* v. *Thoms,* 51 Maine, 503; a tallow factory in *Allen* v. *State,* 34 Texas, 230; a tannery, in *Rex* v. *Pappineau,* 1 Strange, 686; have been declared nuisances, because of their unsuitable

location, but that will not justify a riotous mob in burning and destroying them. A tomb erected upon one's own land is not necessarily a nuisance; but it may become such from its location. *Barnes* v. *Hathorn*, 54 Maine, 125. But it is not therefore to be destroyed. Its use may be prohibited. The plaintiffs' porgy oil factory stands upon the same ground.

These views are sustained by an almost unbroken series of decisions. In *Rex* v. *Pappineau*, 1 Strange, 686, the defendant was indicted for a nuisance by reason of his tannery, and fined £100. A writ of error was brought, and one of the reasons given for its reversal was, "that the judgment was erroneous for want of an adjudication that the nuisance be abated." "But," says Lord Raymond, "regularly the judgment ought to be, to abate so much of the thing as makes it a nuisance. . . If a dye-house or any stinking trade were indicted, you shall not pull down the house where the trade was carried on." In the same case, Reynolds, J., says: "Roasting of coffee was formerly thought a nuisance and yet nobody ever imagined the house in which it was roasted should be pulled down." Then referring to the tannery, he adds, "I should think it would have been going too far, if they had adjudged the whole erection to be abated for a particular abuse of it in dipping some stinking skins." In *Barclay* v. *Com.*, 25 Penn., 503, the nuisance for which the defendant was indicted, was the maintenance and continuance of a barn near to and above a spring reserved for the inhabitants of Bedford, for supplying their general pump with water; and the indictment charged, that by storing hay and feeding cattle, the water of the spring was rendered impure, corrupted and unfit for use. Upon the question whether the sheriff should abate the nuisance by removing the barn, Woodward, J., says: "The offense lay in the use made of the barn and yard in close proximity to the spring, and the nuisance would be effectually abated by discontinuing such use. When an erection or structure itself constitutes the nuisance, as when it is put up in a public street, its demolition or removal is necessary to the abatement of the nuisance; but when the offense consists in a wrongful use of a building harmless itself, the remedy is to stop such use, not to tear down or remove the building itself." In

*Welch* v. *Stowell*, 2 Doug., (Mich.) 332, an action of trespass was brought for the destruction of a house of ill fame by the city marshal of Detroit, acting in pursuance of a city ordinance authorizing him to proceed with sufficient force and demolish the same. "It is said," observed Whipple, J., in delivering the opinion of the court, "that the house was a nuisance. This may be very true; but it was a nuisance in consequence of its being the resort of persons of ill fame. That which constitutes or causes the nuisance may be removed; thus, if a house is used for the purposes of a trade or business by which the health of the public is endangered, the nuisance may be abated by removing whatsoever may be necessary to prevent the exercise of such trade or business; so a house in which gaming is carried on to the injury of the public morals; the individuals by whom it is occupied may be punished by indictment and the implements of gaming removed and a house in which indecent pictures are exhibited is a nuisance which may be abated by the removal of the pictures. . . . . Yet in this and the other cases stated, it will not be contended that a person would be justified in demolishing the house, for the obvious reason that, to suppress the nuisance, such an act was unnecessary. . . So in the case before us the nuisance was not caused by the erection itself, but by the persons who resorted there for the purposes of prostitution." In *Moody* v. *Supervisors of Niagara County*, 46 Barb., 659, an action was brought for the destruction of a bawdy house which was likewise the resort of thieves, robbers and murderers, and it appeared that immediately before its destruction one of the police was murdered by the people congregated there. It was there held that the fact that a house is kept as a house of public prostitution renders it a common nuisance— but that a house cannot be lawfully destroyed by a mob because for the time being it is devoted to a purpose which the law characterizes as a common public nuisance; when it is the unlawful use of a building that constitutes a nuisance the remedy is, to stop such use, not to tear down and demolish the building. In *Gray* v. *Ayres*, 7 Dana, 375, it was held that what constitutes the nuisance should be abated, but not by the destruction of the house, the use of which and the practices therein, constituted the nuisance,

and not the house itself. "Although," remarks Marshall, J., "the destruction of the house might have been the most effectual mode of suppressing the nuisance, yet the house itself was not a nuisance, nor necessarily the cause of one, its destruction was not a necessary means of abating the nuisance and as the right of abating is confined to that which is the nuisance, or which actually produces or must necessarily produce it, the right upon the case made out in the plea did not extend to the destruction of the house." In *Ely* v. *Supervisors of Niagara Co.*, 36 N. Y., 297, a similar case of the destruction of a house of ill fame came before the court, "The property of the plaintiff was not put beyond the pale of the law's protection," remarks Scrugham, J., "by her detestable and criminal conduct. She still had the right to expect and rely implicitly upon the zeal and ability of the proper officers to defend her house and furniture against the unlawful efforts of any public indignation her evil practices might provoke." The same views are fully sustained in Massachusetts by the opinion of Shaw, C. J., in *Brown* v. *Perkins*, 12 Gray, 89, and in Rhode Island by that of Ames, C. J., in *State* v. *Paul*, 5 R. I., 185.

When it is the use of the building which constitutes the nuisance, the abatement consists in putting a stop to such use. The law allows its officers, in execution of its sentence only to do what is necessary to abate the nuisance and nothing more ; *a fortiori*, it will not sanction destruction without limit by individuals. It would be absurd to hold that a manufactory lawful in itself, but producing "offensive smells" is at the mercy of every passer by, whose olfactory nerves are disagreeably affected by its necessary processes.

Even if this was a case in which those specially aggrieved by by the plaintiffs factory would have the right to abate the alleged nuisance, yet as it does not appear by whom its destruction was caused, it cannot appear that it was caused by those who were so situated in reference to it that they would have the right of interference, if there was such right.

The decisions, to which the learned counsel for the defendants in his able and elaborate argument has called our attention, will not be found upon examination adverse to the conclusions to which

we have arrived. In *Underhill* v. *Manchester*, 45 N. H., 214, a suit was brought against the defendant town for the damages caused by the destruction of the plaintiff's property by a mob. The plaintiff kept a saloon. The property destroyed consisted of spirituous liquors, the fixtures of a bar, and the furniture of the saloon. The court held the plaintiff could not recover, because his business led to drunkenness and disorder, and by the provisions of the "act making cities and towns liable for damages caused by mobs or riots" it is provided that "no person or persons shall be entitled to the benefits of this act, if it shall appear that the destruction of his or her property was caused by his or their illegal or improper conduct." The court held that "the illegal and improper conduct" of the plaintiff in keeping a grog shop, was to be regarded as the cause of the destruction of his property. Its decision is placed entirely upon the peculiar language of the statute. Doe, J., in his opinion however says that "the rioters are liable to the plaintiff for the damage done by them. His property, though solely used in violation of law, could not be lawfully destroyed except under process of law. *Brown* v. *Perkins*, 12 Gray, 89. *Woodman* v. *Hubbard*, 25 N. H., 67." But the peculiar language of the New Hampshire statute upon which alone the judgment of the court is based, is not to be found in our statutes, and without such statutory provision, it is obvious, that the views of that court are in accordance with those we have expressed. In *Spalding* v. *Preston*, 21 Vermont, 9, an action of trover was brought for counterfeit coin partly finished against the sheriff by whom they had been seized under process and detained to be used as evidence upon the trial of an indictment against the person in whose possession they were found and likewise to prevent their being put in circulation, but the court held the action was not maintainable. "Such property," remarks Redfield, J., "so to speak is outlawed, and is common plunder." Counterfeit money is *per se* unlawful, but porgy oil is an article of commerce, and its manufacture an honest and lucrative industry. In *Meeker* v. *Van Rensselaer*, 15 Wend., 397, the destruction by individuals of a dwelling house, during the prevalence of the Asiatic cholera, which was cut up into small apartments, inhabited by poor people in a filthy condition

and calculated to breed disease, was sanctioned on the ground that it was a nuisance and "that there was no other way to correct the evil but by pulling down the building." But this case has been doubted in *Welch* v. *Stowell*, 2 Mich., 332, and in a subsequent case in New York, the court say that it can only be sustained upon the ground that in no other way could the safety of the public be preserved. In *Lord* v. *Chadbourne*, 42 Maine, 429, a suit was brought for the value of liquors kept for sale in violation of the statutes of the state, and it was held not maintainable, among other reasons, because it was provided by statute that "no action of any kind shall be maintained in any court in this state either in whole or in part for intoxicating or spirituous liquors," &c. The *status* of the liquors was illegal. They were held for illegal purposes, and with the design of violating the statute. Not so in this case. The plaintiff was engaged in a lawful business. If the place of his manufacturing was improper, that was to be determined by a jury, not by a mob of men in disguise. In *Sherman* v. *Fall River Iron Works Co.*, 5 Allen, 213, it was decided that an unlicensed keeper of a livery stable could not recover for damages to his business by the escape of gas through the ground and into a well of water upon his premises, though he might, for the nuisance to his real estate. To be legally recognized as a keeper of a livery stable he must have a license, but no license is required for manufacturing porgy oil. True, the municipal officers of a town or city by c. 17, § 6, may assign a place for the exercise of any trade or employment specified in § 5, "when they judge it necessary," but it no where appears that there has been any adjudication of such necessity.

II. It is provided by c. 17, § 17, that a stationary engine is not to be used without license and by § 19, that "any such engine erected without a license shall be deemed a common nuisance without any other proof than its use."

But the engine is not *per se* a nuisance. It may become one, when it endangers "the safety of the neighborhood." The remedy of the party aggrieved is by indictment, not by the summary distruction of the engine. By § 20, the municipal officers of the town in which it is erected have the same authority to abate and

remove it when erected without a license as is given to the health committee, or health officer in chapter fourteen for the removal or discontinuance of the nuisances therein mentioned—that is, by c. 14, § 16, they may, after notice, remove them at the expense of the owner, and if he neglects or unreasonably delays he will be liable to a fine of one hundred dollars.

The plaintiffs' engine may be a nuisance in the particular locality of its use, but its destruction is not necessary to its abatement. It may be unlawful. So too are riots and mobs. But mobs cannot set up their own criminal acts as affording an exemption from the consequences of their wrong doings.

It is not denied that the steam engine was so affixed to the realty as to be regarded as part of the same. *Richardson* v. *Copeland*, 6 Gray, 536. If annexed to and part of the factory, the damage or destruction of the same being established, the plaintiffs are entitled to the indemnity given by the statute.

III. The counsel for the defendant requested the court to instruct the jury "that it was the duty of the plaintiffs to furnish to the municipal officers of the town, on request, such evidence as they had discovered, to the end that they might know the offenders and have an opportunity to bring their action against them."

There is no evidence tending to show that any request was made by the officers of the defendant town for information, and if not, there could not have been a refusal to give it. Besides if made it would have been of no avail inasmuch as the offenders were disguised and unknown.

But upon this request, were the facts as therein and thereby assumed, still the defendants have no valid ground of complaint. The instruction given was "that it was the duty of the plaintiffs to satisfy them (the jury) that they used all reasonable diligence to discover the offenders. It was not a question of success or want of success in doing so; but if the plaintiffs used due diligence in discovering and procuring evidence to show who the guilty parties were, in good faith, and for the purpose of convicting them, and communicated such evidence and facts, as they discovered or were known, to the officer whose duty it was to prosecute, and were ready to follow his suggestions and did so act, that

was sufficient, even though they never made complaint to the grand jury."

The instruction given required the use "of all reasonable diligence" to discover the offenders, and the verdict of the jury has affirmed the fact of its exercise.

IV. The defendants offered to show that the plaintiffs' factory was "a public nuisance, and a nuisance to the people residing in the vicinity, but all evidence to show the factory a nuisance was excluded."

It is urged that this evidence should have been received as tending to show contributory negligence on the part of the plaintiffs. In *Moody* v. *Supervisors of Niagara County*, 46 Barb., 659, evidence was offered that the house destroyed was one of ill fame and that its destruction was caused by excitement arising from the murder of one of the police in it, but the court excluded the evidence because it would constitute no defense. In *Ely* v. *Supervisors of Niagara County*, 36 N. Y., 297, a house of ill fame was destroyed by a mob and the point was taken and the evidence offered to show the character of the house was excluded and the exclusion was sustained. "She," (the plaintiff) observes Scrugham, J., "was not to assume that the officers would or could not perform their duty effectually, and, therefore, having no reason to fear the injury or distruction of her property by a riot or mob, she was not careless or negligent in not anticipating that such would be the result of the evil use to which she applied the property. . . The conduct of the plaintiff was not such a cause as would naturally produce or aid in producing the destruction of her property; and its influence in that direction is too remote and uncertain to prevent its being considered such carelessness or negligence as would bar her recovery. All that her conduct can strictly be claimed to have produced was local public indignation; and this lawfully manifested, would not have occasioned or in any manner aided in the destruction of her property." Much more then, cannot the plaintiffs be regarded as guilty of contributory negligence when engaged in a lawful business, if those engaged in an infamous violation of law are not so regarded. To hold that these plaintiffs are guilty of contributory negligence because they were engaged in a manufacture

which was or might be a nuisance, would be to declare judicially that all persons, engaged in a "trade, employment or manufacture" referred to in c. 17, § 5, were guilty, by the very fact of being engaged in such trade, employment or manufacture, of such contributory negligence, that they are without the protection of the law and that by being engaged in such business they were laying the foundation of and contributing to its destruction.

The evidence offered was not admissible to show contributory negligence on the part of the plaintiffs.

The defendant's counsel requested the court to instruct the jury that "if plaintiffs were maintaining their factory with their stationary steam engine without license therefor, they were without legal right so to do; and if they were entitled to recover at all, the measure of damages is three-fourths of the actual value of the property, and not three-fourths of what it might be worth for such use, at that place if they had a right to use it."

This instruction was not given, but the jury were instructed "that if they found for the plaintiffs, the measure of damages was three-fourths of the actual value of the property at the time it was destroyed." The indemnity given by the statute c. 123, § 8, is three-fourths of the value of such injury to his property as the plaintiff may have sustained. Here the injury arose from the destruction of property. The persons by whom the property was destroyed would be responsible for its actual value. They are wrong doers and the possibility of an indictment of the owner is neither excuse nor palliation for them. Abatement by destruction of the plaintiffs' factory and engine would not have been ordered by the judgment of the court; its use might have been prohibited and a fine imposed, but purification by fire is not one of the statutory penalties. The abatement could only be legally made by the judgment of the court upon an indictment in which the parties interested would have a right to appear and defend. The possibility of an indictment is not a contingency, as affecting value, of which a mob could avail itself in reduction of damages. Neither can the defendants, whom the statute has made responsible for the action of such mob.                *Exceptions overruled.*

WALTON, DICKERSON, BARROWS, DANFORTH and VIRGIN, JJ., concurred.